**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

RICK CHEN on behalf of himself and all others similarly situated,

        Plaintiff,

v.

SENDGRID, INC.,
WARREN ADELMAN,
AJAY AGARWAL,
FRED BALL,
BYRON DEETER,
SAMEER DHOLAKIA,
ANNE RAIMONDI,
HILARY SCHNEIDER,
SRI VISWANATH,
TWILIO, INC., and
TOPAZ MERGER SUBSIDIARY, INC.

        Defendants.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

      Plaintiff Rick Chen ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

      1.    Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of SendGrid, Inc. ("SendGrid" or the "Company") against SendGrid and its Board of Directors (the "Board" or the "Individual Defendants," collectively with SendGrid, the

"Defendants") for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to Twilio Inc. (the "Parent"), and Topaz Merger Subsidiary, Inc. (the "Merger Sub," collectively with Parent, "Twilio", collectively with SendGrid and the Individual Defendants the "Defendants") in a proposed all stock transaction valued at approximately $2 billion (the "Proposed Transaction").

2.     The terms of the Proposed Transaction were memorialized in a October 16, 2018, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").   Under the terms of the Merger Agreement, SendGrid will become an indirect wholly-owned subsidiary of Twilio, and SendGrid stockholders will receive 0.485 shares of Twilio Class A common stock for each share of SendGrid common stock they own, resulting in a merger consideration of approximately $36.92 per share of SendGrid common stock based upon the closing price of Twilio Class A common stock on October 15, 2018, the day preceding the announcement merger agreement.

3.     In approving the Proposed Acquisition, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell SendGrid without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Acquisition to benefit themselves and/or Twilio without regard for SendGrid's public stockholders.   Accordingly, this action seeks to enjoin the upcoming stockholder vote on the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to SendGrid's stockholders.

4.     Furthermore, the Individual Defendants, as defined herein, have exacerbated their breaches of express and implied contractual duties and fiduciary duty by agreeing to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Company and act to render the Merger a fait accompli. For example, the Board agreed to: (i) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows Platinum to match any competing proposal in the unlikely event that one emerges; and (iii) up to $69,000,000 in termination fees and expenses if the Board agrees to a competing proposal.

5.     In addition, the Proposed Acquisition may have been tainted by conflicts of interest amongst the Individual Defendants.  Most notably, certain insiders stand to receive financial benefits as a result of the Proposed Acquisition.  For example, upon the consummation of the Proposed Acquisition, each outstanding SendGrid restricted stock unit ("RSU"), option, or other right to purchase Company stock will vest and be cancelled in exchange for the right to receive the Merger consideration.  Significantly, upon information and belief, members of the Company's Board and other Company insiders collectively own thousands of such options for which they will receive immediate liquidity.

6.     Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits with no thought to the Company's public stockholders.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.  Moreover, certain Directors and other insiders will also be the recipients of

lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Transaction.

7.      In violation of sections 14(a) and 20(a) of the Exchange Act, and in in further violation of their fiduciary duties, Defendants caused to be filed a materially deficient Registration Statement on form S-4 (the "S-4") on November 21, 2018 with SEC in an effort to solicit stockholders to vote their SendGrid shares in favor of the Proposed Transaction.  The S-4 is materially deficient and deprives SendGrid stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction.  As detailed below, the S-4 omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for SendGrid, provided by SendGrid to the Company's financial advisor Morgan Stanely & Co LLC ("Morgan Stanley") and Twilio's financial advisor Goldman Sachs & Co. LLC ("Goldman Sachs") for use in their financial analyses; (c) the financial projections for Twilio provided by Twilio to Morgan Stanley and Goldman Sachs for use in their financial analyses; (d) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, Morgan Stanley; and (e) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, Goldman Sachs.

8.      Consequently, the Individual Defendants have breached their fiduciary duties of loyalty and due care.

9.      Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the unreasonable steps

taken by the Defendants in entering into the merger agreement without attempting to maximize stockholder value.  Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.  Plaintiff, on behalf of the Class, seek only to level the playing field and to ensure that if stockholders are to be ultimately stripped of their respective equity interests through the Proposed Acquisition, that the Proposed Acquisition is conducted in a manner that is not overtly improper, unfair and illegal, and that all material information concerning the Proposed Acquisition is disclosed to the SendGrid's stockholder's so that they are able to make informed decisions as to whether to vote in favor or against the Proposed Acquisition or to seek appraisal of their shares.

## PARTIES

10.     Plaintiff Rick Chen is a citizen of the United States and a resident of the state of Washington.  He has been and continues to be a stockholder of SendGrid during all relevant times thereto.

11.     Defendant SendGrid operates as a digital communication platform in the United States and internationally.  SendGrid is a Delaware corporation with its headquarters located at 1801 California Street, Suite 500, Denver, Colorado.  The Company's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "SEND." As of July 23, 2018, the Company had 46,387,368 shares of common stock outstanding.

12.     Defendant Warren Adelman ("Adelman") has served on the SendGrid Board of Directors at all relevant times.  In addition, Adelman serves as a member on the Board's Audit and Compensation Committees.

13.     Defendant Ajay Agarwal ("Agarwal") has served on the SendGrid Board of Directors at all relevant times.  In addition, Agarwal serves on the as a member on the Board's Audit Committee.

14.     Defendant Fred Ball ("Ball") has served on the SendGrid Board of Directors at all relevant times.  In addition, Ball serves as the Chair of the Board's Audit Committee and as a member on the Board's Nominating/Governance Committee.

15.     Defendant Byron Deeter ("Deeter") has served on the SendGrid Board of Directors at all relevant times.  In addition, Deeter serves as the Chair of the Board's Nominating/Governance Committee.

16.     Defendant Sameer Dholakia ("Dholakia") has served on the SendGrid Board of Directors at all relevant times.  In addition, Dholakia serves as SendGrid's Chief Executive Officer ("CEO").

17.     Defendant Anne Raimondi ("Raimondi") has served on the SendGrid Board of Directors at all relevant times.  In addition, Raimondi serves as a member on the Board's Compensation Committee.

18.     Defendant Hilary Schneider ("Schneider") has served on the SendGrid Board of Directors at all relevant times.  In addition, Schneider serves as the Chair of the Board's Compensation Committee and as a member on the Board's Nominating/Governance Committee.

19.     Defendant Sri Viswanath ("Viswanath") has served on the SendGrid Board of Directors at all relevant times.  In addition, Viswanath serves as a member on the Board's Compensation and Nominating/Governance Committees.

20.     Individual Defendants Adelman, Agarwal, Ball, Deeter, Dholakia, Raimondi, Schneider, and Viswanath are and at all times relevant hereto have been, directors of SendGrid.

21.     The Defendants named in paragraphs 15-23 are referred to herein as "Individual Defendants" or "Director Defendants."

22.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care and candor to SendGrid and its stockholders.

23.     By reason of their positions as officers and/or directors of the Company, the Individual Defendants named above are in a fiduciary relationship with Plaintiff and the other public stockholders of SendGrid and owe them the highest duties of good faith, loyalty and due care, as set forth in further detail herein.

24.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship required them to exercise their best judgment, and to act in a prudent manner and in the best interests of the company's stockholders.

25.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

26.     Twilio, Inc. provides a cloud communications platform that enables developers to build, scale, and operate communications within software applications in the United States and internationally.  Parent is a Delaware Corporation with a principal place of business at 375 Beal Street, Suite 300, San Francisco, California.  Parent is listed on the NYSE under the ticker symbol "TWLO".

27.     Merger Sub is a wholly-owned subsidiary of Parent and was created to consummate the Proposed Acquisition and can be served care of Parent.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

29.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because SendGrid's principal place of business is located in the District of Colorado, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of SendGrid common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

32.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. According to the Company's most recent 10-K, as of February 23, 2017, there were more than 36 million common shares of SendGrid's outstanding.  The

8

actual number of public stockholders of SendGrid's will be ascertained through discovery;

b. There are questions of law and fact which are common to the Class, including *inter alia*, the following:

    i.  Whether Defendants have violated the federal securities laws;

    ii.  Whether Defendants made material misrepresentations and/or omitted material facts in the 14D-9; and

    iii.  Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Acquisition is consummated.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f. Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

33.  By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with SendGrid and owe the Company the duties of due care, loyalty, and good faith.

34.  By virtue of their positions as directors and/or officers of SendGrid, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause SendGrid to engage in the practices complained of herein.

35.  Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.  act with the requisite diligence and due care that is reasonable under the circumstances;

b.  act in the best interest of the company;

c.  use reasonable means to obtain material information relating to a given action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f. disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

36. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of SendGrid, are obligated to refrain from:

a. participating in any transaction where the directors' or officers' loyalties are divided;

b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public shareholders; and/or

c. unjustly enriching themselves at the expense or to the detriment of the Company or its shareholders.

37. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to SendGrid, Plaintiff and the other public shareholders of SendGrid, including their duties of loyalty, good faith, and due care.

38. As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their SendGrid common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

39. SendGrid operates as a digital communication platform in the United States and internationally.

40. The Company's cloud-based platform provides various tools to the businesses, including developers and marketers to reach their customers using an email.

11

41.     SendGrid offers services, such as email application programming interface (API), which allow developers to use its API in their preferred development framework and to use its platform to add email functionality to their applications; marketing campaigns that allow marketers to upload and manage customer contact lists, create and test email templates, and execute and analyze email campaigns to engage customers; and expert services to help businesses optimize their email delivery.

42.     SendGrid has a demonstrated history of financial success, recently evidenced by its Q2 2018 financials, which were released on July 31, 2018.  Notably, the Company saw an increase in revenue of 32% year-on-year, and a gross margin improvement of 220 basis points.

43.     Speaking on these positive results, Defendant and Company CEO Dholakia noted, "We had a strong second quarter, with accelerating sequential revenue growth, improving gross margins driving sharply higher profitability, and strong free-cash-flow generation,"

44.     Dholaki further expounded on the Company's strong position and optimistic future outlook by stating "We are pleased that our solid first half is carrying over into the second half, and we are raising our outlook for growth and profitability for the year."

45.     For SendGrid, financial success is not a recent state of affairs, rather the Company has posted strong financials for some time, demonstrating a history of success.  For example, on May 1, 2018, the Company released its Q1 financials for the 2018 year.  Notably, the Company a 31% increase in revenue year-on-year and a 35% increase in customer base year-on-year.

46.     Speaking on these positive results, Defendant Dholakia stated, "Our results this quarter represent a strong first full quarter of being a public company, delivering on our commitment to driving growth and profitability."

47.    SendGrid's incredible financial trajectory has not gone unnoticed by those in the media.  For example, in a July 31, 2018 *Marketwach.com* article, author financial reporter Wallace Witkowski noted that the Company's 2018 Q2 earnings had surged past Wall Street views.

48.    It is clear that SendGrid, which has shown consistent profitable financial results in its recent financial results is a strong Company poised to continue its solid performance in the future.  However, should the Proposed Acquisition be consummated, Plaintiff and all other public stockholders of the Company will be forever foreclosed from benefiting on the future of the Company they invested in.

***The Insufficient Process Leading to the Proposed Transaction***

49.    As detailed in the S-4, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Twilio, who made its intentions clear to purchase the Company even before the SendGrid initial public offering ("IPO") had been carried out.

50.    First, it appears that no market check whatsoever was conducted by Company or its financial advisors during the sales process.  In fact, the S-4 indicates that neither SendGrid nor its financial advisors even attempted to initiate a market check for potentially interested third parties during the sales process.  In fact, the only rudimentary market check which was carried out at any point was a limited outreach in September 2017.  Notably this insufficient market check sent to only four strategic parties and was carried out prior to the Company's IPO.

51.    As such the S-4 lays bare the Board's clear intent to sell the Company to Twilio while attempting to bootstrap and insufficient market check, conducted before the open market had even valued the Company, as a guise of compliance with fiduciary duties.  This decision was

only exacerbated by the Board's decision to enter into exclusivity with Twilio in September of 2018 without any market check having been conducted.

52.     In addition, the S-4 indicates that no committee of independent board members were created to run the sales process.  This is especially concerning given that Individual Defendant Deeter concurrently sat on the Board of Twilio throughout the sales process, and therefore was on both sides of the Proposed Transaction.

53.     Moreover, the S-4 also indicates that the individual defendants at several points throughout the sales process, prior to the sales process's completion, attempted to negotiate with Twilio for further employment for Company insiders.  Such prioritization of their own self-interests makes it clear that the Plaintiff and other public stockholders of SendGrid were not the primary concern for the Board during the sales process.

54.     Finally, the S-4 is unclear as to the nature of specific confidentiality and/or non-disclosure agreements SendGrid entered into with Twilio and any contacted third party throughout the sales process, if any such agreements were different from one another, the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in those agreements, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.

55.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

**The Proposed Acquisition**

56.     On October 15, 2018, SendGrid and Twilio jointly issued a press release announcing they have entered into a definitive merger agreement under which the companies will

combine in an all-stock merger with a total equity value of approximately $2 billion.  The press release stated in relevant part:

> **SAN FRANCISCO — Oct. 15, 2018 —** Twilio (NYSE: TWLO) and SendGrid today announced that they have entered into a definitive agreement for Twilio to acquire SendGrid in an all-stock transaction valued at approximately $2 billion.  At the exchange ratio of 0.485 shares of Twilio Class A common stock per share of SendGrid common stock, this price equates to approximately $36.92 per share based on today's closing prices. The transaction is expected to close in the first half of 2019.
>
> Adding the leading email API platform to the leading cloud communications platform can drive tremendous value to the combined customer bases.  The resulting company would offer developers a single, best-in-class platform to manage all of their important communication channels — voice, messaging, video, and now email as well.  Together, the companies currently drive more than half a trillion customer interactions annualized*, and growing rapidly.
>
> "Increasingly, our customers are asking us to solve all of their strategic communications challenges - regardless of channel.  Email is a vital communications channel for companies around the world, and so it was important to us to include this capability in our platform," said Jeff Lawson, Twilio's co-founder and chief executive officer. "The two companies share the same vision, the same model, and the same values.  We believe this is a once-in-a-lifetime opportunity to bring together the two leading developer-focused communications platforms to create the unquestioned platform of choice for all companies looking to transform their customer engagement."
>
> "This is a tremendous day for all SendGrid customers, employees and shareholders," said Sameer Dholakia, SendGrid's chief executive officer.  "Our two companies have always shared a common goal - to create powerful communications experiences for businesses by enabling developers to easily embed communications into the software they are building.  Our mission is to help our customers deliver communications that drive engagement and growth, and this combination will allow us to accelerate that mission for our customers."
>
> Details Regarding the Proposed SendGrid Acquisition
>
> The boards of directors of Twilio and SendGrid have each approved the transaction.
>
> Under the terms of the transaction, Twilio Merger Subsidiary, Inc., a Delaware corporation and a wholly-owned subsidiary of Twilio, will be merged with and into SendGrid, with SendGrid surviving as a wholly-owned subsidiary of Twilio.  At closing, each outstanding share of SendGrid common stock will be converted into the right to receive 0.485 shares of Twilio Class A common stock, which represents

a per share price for SendGrid common stock of $36.92 based on the closing price of Twilio Class A common stock on October 15, 2018. The exchange ratio represents a 14% premium over the average exchange ratio for the ten calendar days ending, October 15, 2018.

The transaction is expected to close in the first half of 2019, subject to the satisfaction of customary closing conditions, including shareholder approvals by each of SendGrid's and Twilio's respective stockholders and the expiration of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act. Certain stockholders of SendGrid owning approximately 6% of the outstanding SendGrid shares have entered into voting agreements and certain stockholders of Twilio who control approximately 33% of total Twilio voting power have entered into voting agreements, or proxies, pursuant to which they have agreed, among other things, and subject to the terms and conditions of the agreements, to vote in favor of the SendGrid acquisition and the issuance of Twilio shares in connection with the SendGrid acquisition, respectively.

Goldman Sachs & Co. LLC is serving as exclusive financial advisor to Twilio and Goodwin Procter LLP is acting as legal counsel to Twilio. Morgan Stanley & Co. LLC is serving as exclusive financial advisor to SendGrid and Cooley LLP and Skadden, Arps, Slate, Meagher & Flom LLP are acting as legal counsel to SendGrid.

### *The Inadequate Merger Consideration*

57.     Significantly, analyst expectations, the Company's strong market position, extraordinary growth, positive future outlook and synergistic benefits to Twilio, establish the inadequacy of the merger consideration.

58.     The compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company.  Pursuant to the terms of the Merger Agreement, the transaction values Company stock at approximately $36.92 per share.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements and increases in the cash position of the Company in recent years.

59.     For example, the Company has traded as high as $38.66 per share within approximately one month prior to the announcement of the Proposed Transaction, a value that is approximately 4.71% greater than the consideration being offered in the Proposed Transaction, indicating no premium is being paid to Plaintiff or other SendGrid stockholders.

60.     Moreover, financial analysts at KeyCorp have valued the Company as high as $42.00 per share as recently as September 4, 2018, a value that is more than 13.75% greater than that offered in the Proposed Transaction.

61.     Additionally, SendGrid's future success is extremely likely, given the consistent positive financial results it has posted over the past several quarters.  Obviously, the opportunity to invest in such a company on the rise is a great coup for Twilio, however it undercuts the investment of Plaintiff and all other public stockholders.

62.     Finally, the synergistic value of SendGrid to Twilio is most illustrative of the inadequacy of the Merger consideration.  For example, commenting on the Proposed Transaction, Jeff Lawson, CEO of Twilio stated, "We believe this is a once-in-a-lifetime opportunity to bring together the two leading developer-focused communications platforms to create the unquestioned platform of choice for all companies looking to transform their customer engagement."

63.     Furthermore, Defendant Dholakia also commented on the synergistic benefits of the deal to Twilio, stating "Our two companies have always shared a common goal - to create powerful communications experiences for businesses by enabling developers to easily embed communications into the software they are building."

64.     Those in the media also took note of the synergistic benefits to Twilio, with financial reporter Leo Sun at *The Motley Fool* commenting in an October 17, 2018, article that the

Proposed Transaction, "should help the company expand its ecosystem, widen its moat against its rivals, and boost its top and bottom line growth."

65.     Clearly, while the deal will be beneficial to Twilio it comes at great expense to Plaintiff and other public stockholders of the Company.

66.     Moreover, post-closure, SendGrid stockholders will see their voting power diluted significantly as stockholders of Twilio, their ownership share in the surviving entity being significantly smaller than their current holdings, thus shrinking any future benefit from their investment in SendGrid.

67.     Furthermore, all SendGrid stockholders will receive "Class A" Twilio common stock, which holds only one tenth the voting power of "Class B" Twilio common stock that is held by Twilio insiders, further highlighting the diluted power and control over the surviving entity that SendGrid stockholders will have.

68.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Twilio at the expense of SendGrid stockholders, which clearly indicates that SendGrid stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Protection Mechanisms***

69.     The Merger Agreement contains certain provisions that unduly benefit Twilio by making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Merger Agreement contains a termination fee provision that requires SendGrid to pay up to $69 million to Twilio in fees and expenses if the Merger Agreement is terminated under certain circumstances.

70.     The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to SendGrid's stockholders.

71.     The Merger Agreement also contains a "no solicitation" provision that restricts SendGrid from considering alternative acquisition proposals by, *inter alia*, constraining SendGrid's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from soliciting any alternative proposal, but permits the Board to consider a "*bona fide*, unsolicited written Company Acquisition Proposal" if it constitutes or is reasonably calculated to lead to a "*Company Superior Proposal*" as defined in the Merger Agreement.

72.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide Twilio information in order to match any other offer, thus providing Twilio access to the unsolicited bidder's financial information and giving Twilio the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Twilio.

73.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

74.     In addition, the Merger Agreement does not include protections to ensure that the consideration payable to stockholders will remain within a range of reasonableness.   In a conventional transaction which contemplates stock of the acquiring company as a whole or part of the consideration offered in the Proposed Transaction, the parties often negotiate and implement a

"floor" on the value of the consideration payable to stockholders, which establishes the lowest possible price payable.   Such transactions also often include a "collar," which establishes parameters that attempt to minimize the impact of stock price fluctuations on the value of the consideration payable to stockholders.  The Merger Agreement contains none of these protections. Rather, the Merger Agreement contains a *fixed* exchange ratio of 0.485 which means that SendGrid stockholders will receive 0.485 shares of Twilio common stock for each of their shares, *regardless of Twilio's stock price at the close of the transaction*.  Thus, the consideration payable to SendGrid stockholders is not insulated from fluctuations in Twilio's stock price, and stockholders are left in the precarious position of not knowing whether the consideration payable to them will decline further.

75.    Finally, owners of approximately 6.5% of SendGrid have entered into voting agreements with Twilio locking up their shares in favor of the Proposed Transaction and making any third party bid that much more unlikely to be successful.

76.    Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

77.    The breakdown of the benefits of the deal indicate that SendGrid insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of SendGrid.

78.    First and foremost the stockholders owning 6.5% of SendGrid have entered into Voting Agreements requiring them to vote their shares in favor of the Proposed Transaction.  Such

Agreements will make it that much harder for a potentially interested third party to make a bid on the Company.

79.     Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement as follows:

| Holder Name | Option/ RSU Grant Date | Option Expiration Date | Option Exercise Price ($) | Number of Shares of Common Stock Underlying Option as of November 5, 2018 | Number of Vested Shares of Common Stock Underlying Option as of November 5, 2018 | Number of Shares of Common Stock Underlying Option that will Accelerate Vesting upon Effective Time of Merger(1) | Number of Shares of Common Stock Underlying RSUs as of November 5, 2018 | Number of Vested Shares of Common Stock Underlying RSUs as of November 5, 2018 | Number of Shares of Common Stock Underlying RSUs that will Accelerate Vesting upon Effective Time of Merger(2) |
|---|---|---|---|---|---|---|---|---|---|
| Warren Adelman | 04/30/2014 | 04/29/2024 | 1.50 | 101,880 | 101,880 | — | | | |
| | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Ajay Agarwal | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Fred Ball | 04/04/2017 | 04/03/2027 | 5.48 | 30,000 | 15,000 | 15,000 | | | |
| | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Byron Deeter | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Anne Raimondi | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Hilary Schneider | 07/26/2017 | 07/25/2027 | 12.00 | 30,000 | 15,000 | 15,000 | | | |
| | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Sri Viswanath | 10/02/2017 | 10/01/2027 | 12.72 | 30,000 | 15,000 | 15,000 | | | |
| | 05/31/2018 | | | | | | 5,651 | — | 5,651 |
| Sameer Dholakia | 10/08/2014 | 10/07/2024 | 1.83 | 796,328 | 796,328 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 448,144 | 22,407 | 106,434 | | | |
| Craig Kaes | 05/27/2016 | 05/26/2025 | 2.18 | 303,400 | 263,340 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 65,000 | — | 16,250 | | | |
| Pattie Money | 11/01/2016 | 10/31/2026 | 4.24 | 208,380 | 101,343 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 10,000 | — | 2,500 | | | |
| Carrie Palin | 10/01/2018 | | | | | | 105,277 | — | — |
| | 10/01/2018 | | | | | | 7,018 | — | — |
| Stephen Sloan | 12/08/2015 | 12/07/2025 | 2.46 | 319,124 | 209,218 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 50,000 | — | 12,500 | | | |
| Yancey Spruill | 06/26/2015 | 06/25/2025 | 2.18 | 482,965 | 386,821 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 125,000 | — | 31,250 | | | |
| Michael Tognetti | 09/27/2014 | 09/26/2024 | 1.83 | 33,000 | 33,000 | — | | | |
| | 05/27/2015 | 05/26/2025 | 2.18 | 28,500 | 25,531 | — | | | |
| | 04/14/2016 | 04/13/2026 | 2.79 | 80,541 | 48,666 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 40,000 | — | 10,000 | | | |
| Leandra Fishman Yanagawa | 08/16/2016 | 08/15/2026 | 4.24 | 237,847 | 92,625 | — | | | |
| | 07/26/2017 | 07/25/2027 | 12.00 | 10,000 | — | 2,500 | | | |

80.    Moreover, certain employment agreements with certain SendGrid executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by SendGrid's common stockholders, as follows:

| Name | Cash ($)(3) | | Equity ($)(4) | | Perquisites/ Benefits ($)(5) | | Total ($)(6) | |
|---|---|---|---|---|---|---|---|---|
| Sameer Dholakia | $ | 330,000 | $ | 6,042,790 | $ | 7,532 | $ | 6,380,322 |
| Yancey Spruill | $ | 551,250 | $ | 5,966,314 | $ | 14,611 | $ | 6,532,175 |
| Craig Kaes | $ | 90,625 | $ | 1,574,170 | $ | 3,653 | $ | 1,668,448 |

81.    Next, several Company insiders, including Defendant Dholakia will be the recipient of lucrative employment agreements to continue at the surviving entity.  These offers of employment are worth millions of dollars apiece, and are not shared amongst SendGrid public stokholders.

82.    Thus, while the Proposed Transaction is not in the best interests of SendGrid stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete S-4***

83.    On November 21, 2018, the Board, SendGrid and Twilio caused to be filed with the SEC a materially misleading and incomplete S-4 that, in violation their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

84.    Specifically, the S-4 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the S-4 fails to disclose:

  a. The reasoning as to why no market check whatsoever was conducted Company or its financial advisor during the sales process, in particular, after the IPO was completed;

  b. The reasoning as to why the insufficient pre-IPO market check targeted only potential strategic third parties and not financial third parties;

  c. The reasoning as to why no committee of independent board members was created to run the sales process;

  d. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders; and

  e. The S-4 is unclear as to the nature of specific confidentiality and/or non-disclosure agreements SendGrid entered into with Twilio and any other third parties throughout the sales process, if any such agreements were different from one another, the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in those agreements, and if so, the specific conditions, if

any, under which such provisions would fall away or prevent parties from submitting a bid.

*Omissions and/or Material Misrepresentations Concerning SendGrid's Financial Projections*

85.    The S-4 fails to provide material information concerning financial projections provided by SendGrid's management and relied upon by Morgan Stanley in its analyses. The S-4 discloses management-prepared financial projections for the Company which are materially misleading. The S-4 indicates that in connection with the rendering of Morgan Stanley's fairness opinion, Morgan Stanley reviewed "certain financial projections prepared by the managements of SendGrid and Twilio, respectively." Accordingly, the S-4 should have, but fails to provide, certain information in the projections that SendGrid management provided to the Board and Morgan Stanley. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

86.    The S-4 fails to provide material information concerning the financial projections prepared by SendGrid management. Specifically, the S-4 fails to disclose the material line items for the following metrics in both the *SendGrid Management Case* and *SendGrid Street Case*:

      a.    EBITDA; and

      b.    Unlevered Free Cash Flows

87.    Additionally, the S-4 provides several non-GAAP financial metrics, but fails disclose a reconciliation of all non-GAAP to GAAP metrics, as described above.

88.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

89.     Without accurate projection data presented in the S-4, Plaintiff and other stockholders of SendGrid are unable to properly evaluate the Company's true worth, the accuracy of Morgan Stanley's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

*Omissions and/or Material Misrepresentations Concerning Twilio's Financial Projections*

90.     The S-4 fails to provide material information concerning financial projections provided by Twilio's management and relied upon by Morgan Stanley in its analyses.  The S-4 discloses management-prepared financial projections for the Company which are materially misleading.  The S-4 indicates that in connection with the rendering of Morgan Stanley's fairness opinion, Morgan Stanley reviewed "certain financial projections prepared by the managements of SendGrid and Twilio, respectively."  Accordingly, the S-4 should have, but fails to provide, certain information in the projections that Twilio management provided to the Board and Morgan Stanley.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

91.     The S-4 fails to provide material information concerning the financial projections prepared by Twilio management.  Specifically, the S-4 fails to disclose the material line items for the following metrics in both the *Twilio Management Case* and *Twilio Street Case*:

      a.   EBITDA; and

      b.   Unlevered Free Cash Flows

92.     Additionally, the S-4 provides several non-GAAP financial metrics, but fails disclose a reconciliation of all non-GAAP to GAAP metrics, as described above.

93.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

94.     Without accurate projection data presented in the S-4, Plaintiff and other stockholders of SendGrid are unable to properly evaluate Twilio's true worth (and thus the value of the proposed merger consideration), the accuracy of Morgan Stanley's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Morgan Stanley*

95.     In the S-4, Morgan Stanley describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying

assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

96.     With respect to the *Public Trading Comparables Analysis*, the S-4 fails to disclose the following:

      a.   Which SendGrid projections were used as a comparison in the analysis;

      b.   Why different companies were chosen to compare to the Twilio street case and the Twilio management case than compared to SendGrid; and

      c.   The specific line items used to calculate the metrics used including AV/2018 Revenue and AV/2019 Revenue.

97.     With respect to the *SendGrid Public Companies Comparable Analysis*, the S-4 fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the reference ranges of CY2018E AV/Revenue of 8.1x - 11.0x and CY2019E AV/Revenue of 6.3x - 8.8x.

98.     With respect to the *Twilio Public Companies Analysis*, the S-4 fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the reference ranges for Twilio of CY2018E AV/Revenue of 8.9x - 13.4x for the Twilio street case, 9.1x - 18.0x for the Twilio management projections, and CY2019E AV/Revenue of 7.2x - 10.7x for the Twilio street case and 7.2x - 13.4x and for the Twilio management projections.

99.     With respect to the *SendGrid Discounted Equity Value Analysis*, the S-4 fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the reference ranges for CY2019E AV/Revenue of 6.3x - 8.8x; and

      b.   The specific inputs and assumptions used to calculate the discount rate of 11.8%.

100.    With respect to the *Twilio Discounted Equity Value Analysis*, the S-4 fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the reference ranges for CY2019E AV/Revenue of 7.2x – 10.7x; and

      b.   The specific inputs and assumptions used to calculate the discount rate of 10.4%.

101.    With respect to the *SendGrid Discounted Cash Flow Analysis*, the S-4 fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the perpetual growth rates of 3.0% to 4.0%;

      b.   The specific inputs and assumptions used to calculate the discount rate range of 10.8% - 12.8%; and

      c.   The specific reasoning as to why the Morgan Stanley discounted cash flow analyses indicate a value range of SendGrid of $21.58 - $31.41 (street case) and $27.54 - $40.02 (management case) as compared to $25.16 - $46.00 for Goldman Sachs' analysis.

102.    With respect to the *Twilio Discounted Cash Flow Analysis*, the S-4 fails to disclose the following:

a.  The specific inputs and assumptions used to calculate the perpetual growth rates of 3.0% to 4.0%;

b.  The specific inputs and assumptions used to calculate the discount rate range of 9.2% - 11.1%;

c.  The specific reasoning as to why two separate analyses were not done for both Twilio Class A and Twilio Class B common stock; and

d.  The specific reasoning as to why the Morgan Stanley discounted cash flow analyses indicate a value range of Twilio of $52.15 - $81.37 (street case) and $71.10 - $117.60 (management case) as compared to $49.01 - $154.40 for Goldman Sachs' analysis.

103.  With respect to the *Precedent Transaction Premiums Analysis*, the S-4 fails to disclose the following:

a.  The total value of each of the selected transactions;

b.  The specific date on which each selected transaction closed;

c.  The per share value of each selected transaction.

104.  With respect to the *Precedent Transaction Multiples Analysis*, the S-4 fails to disclose the following

a.  The total value of each of the selected transactions;

b.  The specific date on which each selected transaction closed;

c.  The per share value of each selected transaction

105.  These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

106.    Without the omitted information identified above, SendGrid's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, SendGrid's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.  As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Goldman Sachs*

107.    In the S-4, Goldman Sachs describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

108.    With respect to the *Illustrative Financial Contribution Analysis*, the S-4 fails to disclose the following:

a.    The specific set of projections used by Goldman Sachs in this analysis for each of Twilio and SendGrid, specifically, as between the management case and street case for both Companies, or if both sets were used for each Twilio and SendGrid.

109.    With respect to the *Selected Transactions Analysis* for SendGrid, the S-4 fails to disclose the following:

a.    The total value of each of the selected transactions;

   b.   The specific date on which each selected transaction closed;

   c.   The per share value of each selected transaction

110.   With respect to the *Premia Analysis* for SendGrid, the S-4 fails to disclose the following:

   a.   The specific transactions analyzed, including the names of the target and acquirer, price per share, and closing date.

111.   With respect to the *Illustrative Discounted Cash Flow Analysis* for SendGrid, the S-4 fails to disclose the following:

   a.   The specific inputs and assumptions used to calculate the perpetual growth rates of 4.0% to 6.0%;

   b.   The specific inputs and assumptions used to calculate the discount rate range of 10.0% - 12.0%;

   c.   The specific set of projections used by Goldman Sachs in this analysis for SendGrid, specifically, as between the management case and street case;

   d.   The specific reasoning as to why two separate analyses were not done for both the SendGrid Management Case and SendGrid Street Case of projections; and

   e.   The specific reasoning as to why the Morgan Stanley discounted cash flow analyses indicate a value range of SendGrid of $21.58 - $31.41 (street case) and $27.54 - $40.02 (management case) as compared to $25.16 - $46.00 for Goldman Sachs' analysis.

112.   With respect to the *Illustrative Discounted Cash Flow Analysis* for SendGrid, the S-4 fails to disclose the following:

a.  The specific inputs and assumptions used to calculate the perpetual growth rates of 5.0% to 7.0%;

b.  The specific inputs and assumptions used to calculate the discount rate range of 10.0% - 13.0%;

c.  The specific set of projections used by Goldman Sachs in this analysis for Twilio, specifically, as between the management case and street case;

d.  The specific reasoning as to why two separate analyses were not done for both the Twilio Management Case and Twilio Street Case of projections;

e.  The specific reasoning as to why two separate analyses were not done for both Twilio Class A and Twilio Class B common stock; and

f.  The specific reasoning as to why the Morgan Stanley discounted cash flow analyses indicate a value range of Twilio of $52.15 - $81.37 (street case) and $71.10 - $117.60 (management case) as compared to $49.01 - $154.40 for Goldman Sachs' analysis.

113.   These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

114.   Without the omitted information identified above, SendGrid's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, SendGrid's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.  As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**(Against the Individual Defendants)**

115.     Plaintiff repeats all previous allegations as if set forth in full herein.

116.     The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

117.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in SendGrid.

118.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of SendGrid by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of SendGrid to its public stockholders.

119.     Indeed, Defendants have accepted an offer to sell SendGrid at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

120.     Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

121.     The Individual Defendants dominate and control the business and corporate affairs of SendGrid, and are in possession of private corporate information concerning SendGrid's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of SendGrid which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

122.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

123.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of SendGrid's assets and have been and will be prevented from obtaining a fair price for their common stock.

124.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

125.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### (Against Defendants SendGrid, Inc., Twilio Inc., and Topaz Merger Subsidiary, Inc.)

126.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127.     Defendants SendGrid, Inc., Twilio, Inc., and Topaz Merger Subsidiary, Inc., knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

128.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

129.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict

### THIRD COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

130.    Plaintiff repeats all previous allegations as if set forth in full herein.

131.    Defendants have disseminated the S-4 with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

132.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

133.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading or necessary to correct any statement

in any earlier communication with respect to the solicitation of a proxy for the same

meeting or subject matter which has become false or misleading

134.    The S-4 was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the S-4 is materially misleading and omits material facts that are necessary to render them non-misleading.

135.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

136.    The Individual Defendants were at least negligent in filing an S-4 that was materially misleading and/or omitted material facts necessary to make the S-4 not misleading.

137.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

## Violations of Section 20(a) of the Exchange Act

## (Against All Individual Defendants)

138.    Plaintiff repeats all previous allegations as if set forth in full herein.

139.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the S-4 was materially misleading to Company stockholders.

140.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the S-4 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the S-4.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the S-4 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

141.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of SendGrid's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being

concealed from the Company's stockholders and that the S-4 was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the S-4 and are therefore responsible and liable for the misrepresentations contained herein.

142.    The Individual Defendants acted as controlling persons of SendGrid within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause SendGrid to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled SendGrid and all of its employees.  As alleged above, SendGrid is a primary violator of Section 14 of the Exchange Act and SEC Rule S-4.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.    Enjoining the Proposed Transaction;

C.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.    Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for SendGrid and obtain a transaction which is in the best interests of SendGrid and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands trial by jury of all claims so triable.


Dated: December 5, 2018                      */s/ Marc L. Ackerman*
                                             ***Marc L. Ackerman***
                                             BRODSKY & SMITH, LLC
                                             Two Bala Plaza, Suite 510
                                             Bala Cynwyd, PA 19004
                                             Telephone: (610) 667-6200
                                             Facsimile: (610) 667-9029
                                             Email: mackerman@brodskysmith.com

                                             *Attorneys for Plaintiff*